**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **LAW OFFICES OF HILDA L. SIBRIAN, P.C. and HILDA L. SIBRIAN,** | § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § | **No. 4:23-cv-04643** |
| **MCNEIL CONSULTANTS, LLC D/B/A ACCIDENT INJURY LEGAL CENTER, QUINTESSA MARKETING, LLC D/B/A ACCIDENT INJURY LEGAL CENTER and LAUREN MINGEE** | § § § § § § | |
| **Defendants.** | § § | |

---

**QUINTESSA'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

---

i

## <u>TABLE OF CONTENTS</u>

I.    SUMMARY OF ARGUMENT .................................................................................. 1

II.   NATURE OF THE CASE AND STAGE OF PROCEEDINGS ........................................ 2

    A.    Lauren Mingee, a Young Entrepreneur and Trailblazer. ......................................... 2

    B.    Google Keyword Bidding. ................................................................................ 4

    C.    Consumers are Proficient with Search Engines. ..................................................... 5

    D.    Sibrian Sues Quintessa for Trademark Infringement. ............................................. 6

III.  ISSUES TO BE DECIDED ................................................................................... 7

IV.   ARGUMENT AND AUTHORITIES ......................................................................... 7

    A.    Sibrian Cannot Demonstrate Imminent and Irreparable Harm. .............................. 7

        1.    Sibrian's delay rebuts any presumption of irreparable harm. .................... 7

        2.    Sibrian offers no compelling evidence of imminent and
             irreparable harm. ................................................................................ 10

    B.    Sibrian Cannot Establish a Likelihood of Success on the Merits. ........................ 12

        1.    Digits 1 and 2 are not informative in keyword bidding cases.................. 13

        2.    Digits 3 through 5 are not informative in keyword bidding
             cases. ................................................................................................. 14

        3.    Digit 6: Sibrian has not proven intent to mislead or confuse................... 15

             i.    Sibrian offers no compelling evidence that Quintessa
                 intended to cause consumer confusion. ......................................... 16

             ii.   Quintessa has a good faith legal basis for keyword
                 bidding. ...................................................................................... 17

        4.    Digit 7: Sibrian has not proven actual confusion as a matter of
             law. ................................................................................................... 19

        5.    Digit 8: Sibrian has not proven that consumers are
             unsophisticated. ................................................................................... 22

    C.    The Remaining Factors Do Not Support Injunctive Relief. ................................. 23

V.    CONCLUSION .................................................................................................. 24

## **TABLE OF AUTHORITIES**

**Cases**

*1-800 Contacts, Inc. v. JAND, Inc.*, No. 21 Civ. 6966, 2022 WL 2316181
(S.D.N.Y. June 27, 2022)....................................................................... 13, 21, 23

*Acme Refrigeration Supplies, Inc. v. Acme Refrigeration of Baton Rouge, Inc.*,
961 F. Supp. 936 (E.D. La. 1996) ..................................................................... 24

*Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Found. of Am.,
Inc.*, 307 F. Supp. 3d 260 (S.D.N.Y. 2018) ......................................... 14, 18, 19

*Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321 (5th Cir. 2008).................................. 12

*Appliance Liquidation Outlet, L.L.C. v. Axis Supply Corp.*, 105 F.4th 362 (5th Cir. 2024) ......... 16

*Baker v. DeShong*, 821 F.3d 620 (5th Cir. 2016) .................................................... 13, 15

*BCOWW Holdings, LLC v. Collins*, No. SA-17-CA-00379-FB, 2017 WL 3868184
(W.D. Tex. Sept. 5, 2017)............................................................................... 10

*BMC Software, Inc. v. Hughes*, No. H-19-4810, 2022 WL 5406943 (S.D. Tex. 2022) ............... 13

*Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185 (5th Cir. 1975) ............................................ 9

*Brennan's, Inc. v. Brennan*, 289 Fed. App'x 706 (5th Cir. 2008) .................................................. 7

*BuzzBallz, LLC v. JEM Beverage Co., LLC*, No. 3:15-CV- 588, 2015 WL 3948757
(N.D. Tex. Jun. 26, 2015)................................................................................ 9

*Chacon v. Granata*, 515 F.2d 922 (5th Cir. 1975)................................................................... 10

*Cohen v. Hot House Beauty Ltd.*, No. CV 22-1646, 2023 WL 4408919
(W.D. Pa. June 14, 2023)................................................................................ 18

*Concordia Partners, LLC v. Pick*, No. 2:14-CV-009-GZS, 2015 WL 4065243
(D. Me. July 2, 2015) ...............................................................................11, 12, 19

*Crossover Mkt. LLC v. Newell*, No. A-21-CV-00640-JRN, 2022 WL 1797359
(W.D. Tex. Jan. 12, 2022)................................................................................ 9

*Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275
(6th Cir. 1997)................................................................................................ 21

*Deltona Transformer Corp. v. The Noco Co.*, No. 6:19-CV-308-CEM-LHP,
2023 WL 6376363 (M.D. Fla. Sept. 29, 2023)................................................. 18

*Door Sys., Inc. v. Pro–Line Door Sys., Inc.*, 83 F.3d 169 (7th Cir. 1996)..................................... 22

*Ellipse Comm'ns, Inc. v. Caven*, No. 3:07-CV-1922, 2009 WL 497268
(N.D. Tex. Feb. 26, 2009) .................................................................. 9

*Elvis Presley Enters. v. Capece*, 141 F.3d 188 (5th Cir. 1998) .................................................. 13

*Expedi, Inc. v. Rebound Int'l, LLC*, No. 4:20-CV-3897, 2021 WL 3702169
(S.D. Tex. May 13, 2021) .................................................................. 8

*Flushing Bank v. Green Dot Corp.*, No. 13-Civ-9120, 2015 WL 5802385
(S.D.N.Y. Oct. 5, 2015) .................................................................. 21

*Flywheel Fitness, LLC v. Flywheel Sports, Inc.*, No. 4:13-CV-48,
2013 WL 12138593 (E.D. Tex. Feb. 6, 2013) .................................................. 9

*Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280 (5th Cir. 2020)........ 22

*George and Co. LLC v. Imagination Ent. Ltd.*, 575 F.3d 383 (4th Cir. 2009) ...................... 20, 21

*Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d 603 (N.D. Tex. 2006)............................ 8

*H.D. Vest, Inc. v. H.D. Vest Mgmt. & Se*rvs., No. 3:09-CV-390, 2009 WL 1766095
(N.D. Tex. June 23, 2009) .................................................................. 9

*Hearts on Fire Co., LLC v. Blue Nile, Inc.,* 603 F. Supp. 2d 274 (D. Mass. 2009) ...................... 19

*Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100 (6th Cir. 1991)............. 22

*Innovation Ventures, LLC v. Ultimate Lifestyles, LLC*, No. 4:08-CV-232,
2009 WL 1490588 (E.D. Tex. May 27, 2009) .................................................. 9

*Jim S. Adler, P.C. v. McNeil Consultants, L.L.C.*, 10 F.4th 422 (5th Cir. 2021)...................... 17, 19

*L & W Ins., Inc. v. Harrington*, No. 2730-VCP 2007 WL 2753006
(Del. Ch. Mar. 12, 2007).................................................................. 9

*Lerner & Rowe, PC v. Brown Engstrand & Shely LLC, et al.*, No. 2:14-CV-009-GZS,
2015 WL 4065243 (D. Me. July 2, 2015) .................................................. 20, 21

*Mary Kay, Inc. v. Weber*, 661 F.Supp.2d 632 (N.D. Tex. 2009) .................................................. 18

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) .................................................................. 7

*Nat'l Bus. Forms & Printing, Inc. v. Ford Motor Co.*, 671 F.3d 526 (5th Cir. 2012).................. 16

*Nautilus Grp., Inc. v. ICON Health and Fitness, Inc.*, 372 F.3d 1330 (Fed. Cir. 2004) .............. 21

*Network Automation v. Advance Sys. Concepts, Inc.*, 638 F.3d 1137 (9th Cir. 2011)............. 13, 15

iv

*New England Mercantile Grp., LLC v. Barnell*, No. X03HHDCV146069683S,
    2019 WL 2307446 (Conn. Super. Ct. Apr. 2, 2019) ........................................ 14

*Nora Beverages, Inc. v. Perrier Grp. of Am., Inc*., 269 F.3d 114 (2d Cir. 2001) ......................... 21

*Oreck Corp. v. U.S. Floor Sys., Inc*., 803 F.2d 166 (5th Cir. 1986) ............................................... 22

*Petro Stopping Centers, L.P. v. James River Petroleum, Inc*., 130 F.3d 88 (4th Cir. 1997).... 20, 21

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020 (9th Cir. 2004) ................... 15

*Pruvit Ventures, Inc. v. Forevergreen Int'l LLC*, 4:15-CV-571-ALM-CAN,
    2015 WL 9876952 (E.D. Tex. Dec. 23, 2015) ..................................................... 9

*Quick Techs., Inc. v. The Sage Grp., PLC*, 313 F.3d 338 (5th Cir. 2002) ..................................... 16

*RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*, 655 F. Supp. 2d 679 (S.D. Tex. 2009) ................ 13

*Schelske v. Austin*, No. 6:22-CV-049-H, 2023 WL 5986462 (N.D. Tex. Sept. 14, 2023) ............11

*Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477 (5th Cir. 2004) ........................ 13, 15, 17

*Solofill, LLC v. Rivera*, No. CV H-16-2702, 2017 WL 514589 (S.D. Tex. Feb. 8, 2017) ............. 9

*Spark Connected, LLC v. Semtech Corp.*, No. 4:18-CV-748-ALM-KPJ,
    2019 WL 4305735 (E.D. Tex. Sept. 10, 2019) ..................................................... 8

*Springboards to Educ., Inc. v. Houston Indep. Sch. Dist*., 912 F.3d 805 (5th Cir. 2019) ...... 13, 22

*Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc*., 851 F.3d 440 (5th Cir. 2017) .............. 13, 22

*Tex. Tamale Co., Inc. v. CPUSA2, LLC*, No. 4:21-CV-3341, 2024 WL 2836241
    (S.D. Tex. June 4, 2024) ........................................................................................ 19

*US Risk Ins. Grp., Inc. v. US Risk Mgmt., LLC,* No. 3:-11-CV-2483,
    2013 WL 4504754 (N.D. Tex. Aug. 20, 2013) ................................................... 22

*Vista India v. Raaga*, LLC, 501 F. Supp. 2d 605 (D.N.J. 2007).................................................... 24

*W. Sur. Co. v. PASI of LA, Inc.*, 334 F. Supp. 3d 764 (M.D. La. 2018) ........................................ 10

*Wireless Agents, L.L.C. v. T-Mobile, USA, Inc.*, CIV.A. 3:05-CV-0094D,
    2006 WL 1540587 (N.D. Tex. June 6, 2006) ..................................................... 9

*WorkshopX Inc. v. Build a Sign, LLC*, No. 1:18-CV-850-RP, 2019 WL 5258056
    (W.D. Tex. June 26, 2019).................................................................................... 18

**Other Authorities**

J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION
    (4th ed. 2014) ................................................................................................. 20

Franklyn and Hyman, *Trademarks as Keywords: Much Ado About Something*?,
    26 Harv. J.L. & Tech. 481 (2013) ..................................................................... 5

Goldman, *Brand Spillovers*, 22 Harv. J.L. & Tech. 381 (Spring 2009)......................................... 5

J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION
    (5th ed. 2024) ................................................................... 5, 6, 17, 19

Professional Ethics Committee for the State Bar of Texas, Opinion No. 661 (July 2016)....... 5, 23

McNeil Consultants, LLC, Quintessa, LLC, and Lauren Mingee ("Quintessa" or "Defendants") file this Response to the Law Offices of Hilda L. Sibrian's and Hilda L. Sibrian's ("Sibrian" or "Plaintiffs") Motion for Preliminary Injunction ("Motion") (Dkt. #40).

## I.    SUMMARY OF ARGUMENT

Sibrian seeks an extraordinary and drastic remedy—a preliminary injunction—to stop Quintessa from engaging in lawful and fair competition in the market for personal injury leads. Sibrian's Motion is untimely, unsupported, and unwarranted. The Court should deny it for at least three reasons.

***First***, Sibrian has slept on her rights for years. She has known since February 2020 that Quintessa bid on the Sibrian Marks as keywords for Google ads, a common practice among advertisers in many industries. Yet, Sibrian did nothing to stop Quintessa until October 2023, when she sent a demand letter. Two months later, she filed this lawsuit. But even then, Sibrian did not seek immediate injunctive relief. Instead, she waited for another nine months before filing this motion. Such a long and unexplained delay belies any claim of urgency or irreparable harm. It also rebuts the presumption of irreparable harm under the Lanham Act.

***Second***, Sibrian has no likelihood of success on the merits. She has failed to show that Quintessa's use of the Sibrian Marks as keywords causes any consumer confusion, let alone actionable confusion. Quintessa does not display the Sibrian Marks in its ads. Quintessa clearly identifies itself as a third-party intake representative for personal injury lawyers. Quintessa does not divert or deceive any potential clients of Sibrian. And Quintessa has not passed on any callers who mention Sibrian to its attorney clients. The evidence Sibrian relies on shows only a handful of wrong number calls over four years, none of which resulted in any harm to her. These calls represent a *de minimis* and fleeting level of confusion that is insufficient to establish infringement.

**_Finally_**, the balance of harms and the public interest weigh heavily against granting the injunction. Sibrian has not shown any imminent or irreparable harm from Quintessa's conduct. She has not lost any clients, revenue, or goodwill because of Quintessa's ads. She has not suffered any reputational damage or dilution of her marks. On the other hand, Quintessa would suffer significant harm if enjoined from using the Sibrian Marks as keywords. Quintessa would lose its ability to compete effectively and fairly in the market for personal injury leads. Quintessa would lose its investment in its Google ads campaigns and its relationships with its attorney clients. And Quintessa would also lose its right to engage in truthful and non-misleading commercial speech. Further, the public interest would be disserved by an injunction that would deprive consumers of information and choice in the market for personal injury representation. An injunction would also create a chilling effect on legitimate and beneficial keyword advertising practices. For these reasons, the Court should deny Sibrian's Motion for Preliminary Injunction.

## II.   NATURE OF THE CASE AND STAGE OF PROCEEDINGS

### A.   Lauren Mingee, a Young Entrepreneur and Trailblazer.

Lauren Mingee is a successful entrepreneur, volunteer, mentor, and longtime advocate for women.[1] Though Mingee is now the CEO of Quintessa, LLC, a lead-generating company she founded in 2019, Mingee began her career in management and sales at AT&T in 2008.[2] By 2010, Mingee was working for an advertising agency where she developed commercials for personal injury lawyers.[3] During this time, Mingee began to learn about search engine optimization (SEO) and how to assist her clients to develop their website and content to rank in the No. 1 position on Google.[4] Mingee began to work exclusively on SEO for attorneys, and after several years of

---

[1] https://www.prweb.com/releases/2022/7/prweb18801067.htm; Ex. A (Mingee Decl.) ¶¶ 2-3, 10-12.
[2] Ex. A (Mingee Decl.) ¶ 2.
[3] _Id._
[4] _Id._

managing attorney clients and helping law firms manage after-hour telephone calls, in 2015, Mingee started to learn about pay-per-click (PPC) Google Ads.[5]

After working for others for several years, Mingee took her years of experience and knowledge in internet advertising for law firms and attorney call-center management and created McNeil Consultants, LLC in 2016.[6] Through McNeil Consultants, LLC, Mingee focused on PPC advertising, and began operating her own call center and generating leads by running call-only advertisements on Google Ads under the name "Accident Injury Legal Center" (AILC).[7]

In 2019, Mingee re-branded under the name Quintessa, LLC.[8] Quintessa is not a "lawyer referral service." Mot. at 2. Located in Oklahoma City, with over 100 employees, Quintessa is a well-established marketing firm.[9] Mingee created Quintessa to bridge the gap between accident injury victims who need legal representation with the lawyers who can help them.[10] Quintessa does this through multiple channels of internet advertising. With over 44 law firm or attorney clients across 15 states, Quintessa specializes in giving personal injury law firms a competitive edge in marketing by delivering high-quality client leads.[11] It gathers necessary information from potential new clients, vets them, and then signs them up on a law firm's retainer agreement.[12] Quintessa operates its own highly trained intake department from 7am - 8pm, 7 days a week.[13] Performance is evaluated hourly by Intake Managers with a 1:11 ratio.[14] Calls are listened to by an audit team and a training team is available for real-time coaching.[15]

---

[5] *Id.*
[6] *Id.* ¶ 3.
[7] *Id.*
[8] *Id.*
[9] *Id.* ¶¶ 3-4.
[10] *Id.* ¶ 3.
[11] *Id.* ¶ 4.
[12] *Id.* ¶¶ 4-5.
[13] *Id.* ¶ 4.
[14] *Id.* ¶ 5.
[15] *Id.*

**B.    Google Keyword Bidding.**

Google is the most used online search engine.[16] When someone enters a search term or a query into a search engine, among other types of results, the searcher is presented with organic results (unpaid websites) and paid advertisements.[17] Advertisements on a Search Engine Result Page (SERP) are displayed as a result of the words in the search query and keyword bidding by advertisers.[18] Advertisers can bid on certain keywords so that their ads have the opportunity to appear when searches contain these words.[19] Advertisers generally pay the search engine only when people click on the ads shown in the search results, known as (PPC) advertising or paid search.[20] Advertisers are not charged for the ads appearing; advertisers only pay when a searcher clicks on a displayed ad.[21]

An advertiser can bid on different kinds of search words (*i.e.* keywords), including branded keywords which may be a competitor's brand names (like "Hilda Sibrian") or generic words (like "personal injury attorney").[22] Competitor bidding is a practice that occurs across several industries, including the legal industry.[23] Competitive bidding is a well-known practice among advertisers, and many searchers encounter this situation frequently when online searching.[24]

Advertisements can appear in several forms. One example is click-to-call. In response to a search query on a mobile device, advertisements may appear as click-to-call ads, which allow the searchers to call a phone number directly by clicking on the ad's link.[25] In all other respects, a

---

[16] Ex. H (Jansen Decl.) ¶ 10.
[17] *Id.* ¶ 6.
[18] *Id.* ¶ 8.
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.* ¶¶ 6,8.
[24] *Id.*
[25] *Id.* ¶ 7.

click-to-call ads is the same as a typical search engine ad in appearance and function. Click-to-call advertising has been around for over a decade and is a format familiar to searchers using mobile devices.[26]

## C.   Consumers are Proficient with Search Engines.

Most consumers using search engines are proficient with searching and are aware of search result advertisements, such as sponsored links and google advertisements.[27] Eric Goldman, one of the leading experts in the fields of internet law and intellectual property, notes that "many consumers entering a trademarked search term may not be looking for the trademark owner's goods or services."[28] Recent surveys and studies show that consumer search expectations are decidedly mixed.[29] One survey found that 47% of respondents said they wanted information about the specific brand they searched for, 31% wanted information about similar products from other brands and 22% had no preference.[30]

The Professional Ethics Committee for the State Bar of Texas also recognizes that "a person familiar enough with the internet to use a search engine to seek a lawyer should be aware that there are advertisements presented on web pages showing search  results."[31] McCarthy has also opined on consumer search behavior, stating that "[i]n the author's view, a computer user who sees a search engine results page and clicks on a non-deceptive advertising link resulting from a trademark keyword purchased by a competitor is not confused as to the source or affiliation of any ultimate purchase that is made from that website."[32] The appearance of an ad on a SERP does not

---

[26] *Id.* ¶¶ 6, 7, 15.
[27] *Id.* ¶¶ 6, 15.
[28] Goldman, *Brand Spillovers*, 22 Harv. J.L. & Tech. 381, 412 (Spring 2009).
[29] Franklyn and Hyman, *Trademarks as Keywords: Much Ado About Something*?, 26 Harv. J.L. & Tech. 481, 517 (2013).
[30] 5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25A:7 (5th ed. 2024) (citing Franklyn and Hyman, *Trademarks as Keywords: Much Ado About Something?*, 26 Harv. J.L. & Tech. 481, 517 (2013)).
[31] Professional Ethics Committee for the State Bar of Texas, Opinion No. 661 at 2-3 (July 2016).
[32] 5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25A:8 (5th ed. 2024)

mean that a person will click on the ad.[33] Click-through rates for ads are usually low; most clicks occur on the organic results.[34] Low click-through-rates are typical and not surprising among consumer search behavior for several reasons, including that searchers are adept at circumventing ads today or employing ad blockers where the ads are never seen.[35] Even if an ad is clicked on, it does not mean that a user will convert, *i.e.,* make a transaction—most clicks on ads do not lead to conversions and conversions for ads are low.[36]

## D.    Sibrian Sues Quintessa for Trademark Infringement.

Since as far back as 2020, Sibrian, Quintessa, and many other companies, including other law firms, have bid on the Sibrian Marks as keywords for Google ads.[37] Just like Quintessa, Sibrian bids on the Sibrian Marks as keywords and has access to a pre-built report in Google called an Auction Insights Report.[38] Auction Insights Reports are generated each time an auction for bidding on a specific keyword occurs, and lets the user compare their performance with other advertisers who participated in the same auction. Importantly, Auction Insights Reports contain information on the identities of the other bidders.

For example, Sibrian's Auction Insights Reports indicate that as early as February 24, 2020, ██████████████████████████████████████████████ ██████████ Despite knowing that Quintessa was bidding on her marks, Sibrian did not contact Quintessa until three and a half years later. On October 10, 2023, Sibrian sent Quintessa a demand letter    alleging    that    one    of    Quintessa's    Google    ads    that    was    linked    to

---

[33] Ex. H (Jansen Decl.) ¶¶ 9-11.
[34] *Id.* ¶ 9.
[35] *Id.*
[36] *Id.*
[37] *See* Ex. B (Sibrian's Auction Insights Report, Feb. 2020).
[38] *Id.*
[39] *Id.*

"www.accidentinnjurylegalcenter.com" was infringing on Sibrian's Marks.[40] Quintessa responded

to this demand letter on October 31 and asserted that Quintessa's conduct was not only legal, but

common practice across all industries.[41]

Then, on December 12, 2023, Sibrian filed the present lawsuit claiming that Quintessa's

bidding on Sibrian's Marks as keywords for Google ads constituted trademark infringement under

the Lanham Act.[42] Nine months after Sibrian filed her original complaint (which did not include a

request for preliminary injunctive relief), she filed the present Motion.

### III.    ISSUES TO BE DECIDED

The sole issue to be determined by the Court is whether the Court should deny Sibrian's

Motion for Preliminary Injunction. "A preliminary injunction is an extraordinary and drastic

remedy, one that should not be granted unless the movant, by a clear showing, carries the burden

of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal citations omitted). A

plaintiff must prove: (1) a substantial likelihood of success on the merits, (2) a substantial threat

that they will suffer irreparable injury if the injunction is denied, (3) that the threatened injury

outweighs any damage that the injunction might cause the defendant, and (4) that the injunction

will not disserve the public interest. *Brennan's, Inc. v. Brennan*, 289 Fed. App'x 706, 707 (5th Cir.

2008).

### IV.    ARGUMENT AND AUTHORITIES

**A.    Sibrian Cannot Demonstrate Imminent and Irreparable Harm.**

**1.    *Sibrian's delay rebuts any presumption of irreparable harm.***

Sibrian's unexcused delay in filing this lawsuit and seeking injunctive relief rebuts any

---

[40] *See* Ex. C (Sibrian's Demand Letter to Quintessa).
[41] *See* Ex. D (Quintessa's Response to Sibrian's Demand Letter).
[42] *See* Plaintiff's Original Complaint (Dkt. #1).

presumption of irreparable harm. *Expedi, Inc. v. Rebound Int'l, LLC*, No. 4:20-CV-3897, 2021 WL 3702169, at *3 (S.D. Tex. May 13, 2021); *Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006). Sibrian knew of the alleged infringing conduct by at least February 2020, when her Google Auction Insights Report showed that ████████████████████████████ ████████████.[43] Sibrian then waited over three years to send Quintessa a demand letter, and another two months to file this lawsuit.[44] Sibrian fails to explain this ***three-year*** delay, and therefore is not entitled to any presumption of irreparable harm *Expedi*, 2021 WL 3702169, at *3 (denying preliminary injunction where lawsuit was filed nine months after discovery of infringing marks).

Worse, Sibrian then waited another ***nine months*** after filing her lawsuit to request injunctive relief—***four and a half years*** after Sibrian discovered the alleged infringing conduct. "If the alleged harms to [Sibrian's] business were indeed as detrimental as [Sibrian] asserts, [Sibrian] should have sought injunctive relief as soon as practicable after learning of the acts which [she] argues constitutes" trademark infringement. *Spark Connected, LLC v. Semtech Corp.*, No. 4:18-CV-748-ALM-KPJ, 2019 WL 4305735, at *9 (E.D. Tex. Sept. 10, 2019). Courts routinely deny injunctive relief under these similar circumstances. *See Solofill, LLC v. Rivera*, No. CV H-16-2702, 2017 WL 514589, at *4 (S.D. Tex. Feb. 8, 2017) (collecting cases denying injunctive relief based on delay).[45] This Court should do the same.

---

[43] *See* Ex. B (Sibrian's Auction Insights Report, Feb. 2020).

[44] *See* Ex. C (Sibrian's Demand Letter to Quintessa); Dkt. #1.

[45] *See also Flywheel Fitness, LLC v. Flywheel Sports, Inc.*, No. 4:13-CV-48, 2013 WL 12138593, at *4 (E.D. Tex. Feb. 6, 2013) (finding where a competing company had "begun marketing to and serving customers in Dallas, and after filing its petition . . . Plaintiff still waited ***two more months*** before finally seeking injunctive relief;" "[T]his sort of delay defeats any claim of irreparable harm.") (emphasis added); *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (affirming denial of temporary injunctive relief in light of, in part, a ***three-month*** delay); *Pruvit Ventures, Inc. v. Forevergreen Int'l LLC*, 4:15-CV-571-ALM-CAN, 2015 WL 9876952, at *8 (E.D. Tex. Dec. 23, 2015) (collecting cases and finding undue delay where movant delayed approximately ***five months***); *H.D. Vest, Inc. v. H.D. Vest Mgmt. & Ser*vs., No. 3:09-CV-390, 2009 WL 1766095, at *3 (N.D. Tex. June 23, 2009) (finding delay of ***five months*** between learning of alleged infringement and seeking preliminary relief precluded irreparable harm);

---

Moreover, Sibrian has no explanation for this delay. *See Wireless Agents, L.L.C. v. T-Mobile, USA, Inc.*, CIV.A. 3:05-CV-0094D, 2006 WL 1540587, at \*4 (N.D. Tex. June 6, 2006) (cleaned up) ("Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request."). Sibrian suggests that on July 12, 2024, "Defendants produced for the first time evidence that their unlawful conduct has directly led to actual confusion of Sibrian's existing and potential clients." Mot. at 2.[46] But this, of course, is no excuse. Sibrian could have requested a preliminary injunction and expedited discovery when she filed suit.[47] But she did not. *See, e.g.*, *Crossover Mkt. LLC v. Newell*, No. A-21-CV-00640-JRN, 2022 WL 1797359, at \*2 (W.D. Tex. Jan. 12, 2022) (holding that plaintiff's claim that it "worked diligently to . . . gather materials in support of its [preliminary injunction] [m]otion" was "unpersuasive" and "the most generic reason possible that could be given" for delay in requesting injunctive relief); *W. Sur. Co. v. PASI of LA, Inc.*, 334 F. Supp. 3d 764, 800 (M.D. La. 2018) (denying preliminary injunctive relief on basis of delay and finding compelling that plaintiffs had not sought expedited discovery). Accordingly, the Lanham Act's presumption of irreparable harm is inapplicable, and the Motion should be denied.[48]

---

*BuzzBallz, LLC v. JEM Beverage Co., LLC*, No. 3:15-CV- 588, 2015 WL 3948757, at \*6-7 (N.D. Tex. Jun. 26, 2015) (finding delay of *six months* in filing request for preliminary relief precluded irreparable harm); *Gonannies*, 464 F. Supp. 2d at 609 (finding *six-month* wait before seeking injunctive relief constituted undue delay even where the movant raised a presumption of irreparable harm); *Ellipse Comm'ns, Inc. v. Caven*, No. 3:07-CV-1922, 2009 WL 497268, at \* 2 (N.D. Tex. Feb. 26, 2009) (finding delay of over *seven months* after learning of alleged infringement demonstrated lack of urgency and therefore no substantial threat of irreparable harm); *Innovation Ventures, LLC v. Ultimate Lifestyles, LLC*, No. 4:08-CV-232, 2009 WL 1490588, at \*3 (E.D. Tex. May 27, 2009) (finding *nine-month* delay between learning of infringing conduct and injunctive relief to be undue delay where plaintiff provided no explanation for the delay); *L & W Ins., Inc. v. Harrington*, No. 2730-VCP, 2007 WL 2753006, at \*12 (Del. Ch. Mar. 12, 2007) (delay "in waiting approximately *one month* before seeking to enjoin [defendant] from soliciting former clients undermines its claim of irreparable harm") (emphasis added).

[46] Sibrian implies her delay was in part due to Sibrian's change in counsel. *See* Mot. at 7 n.3. Sibrian's change in counsel does not excuse Sibrian's failure to timely seek injunctive relief.

[47] Quintessa's July 12, 2024 production was made in the ordinary course of discovery. Further, July 12, 2024 was the first time *both* parties made their initial document productions.

[48] *See Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) ("Significant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement.").

2.     *Sibrian offers no compelling evidence of imminent and irreparable harm.*

In addition, "[a]n injunction is appropriate only if the anticipated injury is imminent **and** irreparable." *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975) (emphasis added). Sibrian makes no effort to demonstrate any risk of imminent harm. In fact, the evidence conclusively establishes that Sibrian is **not** at risk of imminent or irreparable harm.

First, Sibrian relies on a collection of call notes created by Quintessa's intake call representatives and recordings of intake calls. Mot. at 7-9. Not a single call occurred in recent history. These documents show that Quintessa has not received even a single call referencing Sibrian in almost **two years**, with the last call occurring on October 11, 2022. *See* Mot. at 8-9, Ex. 2, Ex. 31. Sibrian also cites to on an internal Slack message from Quintessa containing "Sibrian." Yet, this too, was sent on October 11, 2022. *See* Mot. at 10, Ex. 32. Evidence of past alleged wrongs, like Sibrian relies on, cannot be the basis of preliminary injunctive relief because such evidence is no indication of *imminent* harm. *See BCOWW Holdings, LLC v. Collins*, No. SA-17-CA-00379-FB, 2017 WL 3868184, at *17 (W.D. Tex. Sept. 5, 2017) ("Preliminary injunctions are extraordinary remedies and are designed to prevent future injuries, not to punish for past wrongs."); *Schelske v. Austin*, No. 6:22-CV-049-H, 2023 WL 5986462, at *25 (N.D. Tex. Sept. 14, 2023) ("To obtain relief for a future injury, the plaintiff must show that such an injury is "certainly impending" or that "there is a real and immediate threat of repeated injury.").

The Court can also reject Sibrian's argument that the harm is irreparable because Sibrian's clients or prospective clients are clicking on Quintessa's ads, and that Sibrian "cannot identify what results she may have been able to obtain if she had represented the accident victims instead of some other lawyer to whom Defendants referred the case." Mot. at 1. As an initial matter, the fact that consumers click on Quintessa's ads over Sibrian's is not, without more, evidence of irreparable harm. In *Concordia Partners, LLC v. Pick*, the court squarely addressed this question

and denied injunctive relief for lack of irreparable harm:

> "[T]he Court declines to find that Pick will experience irreparable harm to her mark if Concordia is allowed to continue to buy ads using the 'women to women' keywords. Currently, any customer who searches for 'women to women' in Google or Yahoo apparently sees Pick's website link in addition to the WHN ad, which is designated as an "ad" by both search engines. Assuming the potential customer chooses to click on the WHN ad, upon investigation at the WHN website, the potential customer would see the disclaimer that 'our relationship with Women to Women has ended—we're now Women's Health Network.' A reasonably prudent customer who only wishes to buy from Women to Women would likely turn back at this point and reexamine the search results."

No. 2:14-CV-009-GZS, 2015 WL 4065243, at *9 (D. Me. July 2, 2015).[49]

What the court surmised in *Concordia* about consumer behavior is exactly what the evidence shows in this case. For example, in 2024, Quintessa received ▮ calls out of ▮ "impressions" (meaning the number of times a Quintessa ad triggered by a Sibrian keyword appeared in the search results), and none of those callers referenced Sibrian. In 2023, Quintessa received ▮ calls out of ▮ impressions on ads triggered by Sibrian keywords, and none of those callers mentioned Sibrian either. As Sibrian acknowledges, Quintessa has received a total of ▮

▮ Mot. at 8.

Moreover, Quintessa did not convert any of these callers into leads.[50] ▮

▮ *See* Mot., Ex. 2. ▮

▮ *See id.* In short, ▮

---

[49] The court's denial of injunctive relief was bolstered by the plaintiff's seventeen-month delay in requesting injunctive relief, just like Sibrian's delay in this case. *Concordia Partners*, 2015 WL 4065243, at *6-7.
[50] *See* Ex. G (Defendants' Objections and Answers to Plaintiffs' Second Set of Interrogatories, Rog. No. 16) ("Defendants were unable to identify any leads that were generated in connection with advertisement triggered by the Sibrian Marks during the Relevant Period [January 1, 2020 to present].").

**QUINTESSA'S RESPONSE IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**                      **Page 11**

████████████████████████████████, not a single one of these calls demonstrates any harm to Sibrian as there is no evidence that Quintessa diverted Sibrian's actual or prospective clients away from her. The data merely shows that after the callers clicked on Quintessa's ads and called Quintessa, they "turned back" when they realized they were not talking to Sibrian. *Concordia*, 2015 WL 4065243, at *9. This is not evidence of irreparable harm under the law.[51]

## B.    Sibrian Cannot Establish a Likelihood of Success on the Merits.

To establish a trademark infringement claim under the Lanham Act, a plaintiff must: (1) establish ownership in a legally protectable mark;[52] and (2) show infringement by demonstrating a likelihood of confusion. *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 474 (5th Cir. 2008). To evaluate "likelihood of confusion," the Fifth Circuit directs courts to consider the following nonexclusive list of factors known as the digits of confusion to decide whether the alleged use of a mark was confusing:

> (1) the type of trademark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, (7) any evidence of actual confusion, and (8) the degree of care exercised by potential purchasers.

*Springboards to Educ., Inc. v. Houston Indep. Sch. Dist.*, 912 F.3d 805, 811–12 (5th Cir. 2019) (quoting *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 453 (5th Cir. 2017)). No one factor is dispositive. *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998). "Rather, the court must assess each digit individually and then weigh them as a whole to determine whether there is a likelihood of confusion." *BMC Software, Inc. v. Hughes*, No. H-19-4810, 2022

---

[51] *See GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984) ("We hold that when the movant shows no specific harm other than the harm that is presumed to exist when there is a likelihood of confusion, movant's delay in bringing suit is an important factor in determining irreparable harm.").

[52] For the purpose of this response, Quintessa does not contest Sibrian's ownership over the Sibrian Marks.

WL 5406943, at *3 (S.D. Tex. 2022) (citing *RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*, 655 F. Supp. 2d 679, 697 (S.D. Tex. 2009)).[53] An analysis of the digits of confusion in this case reveals that Sibrian is unlikely to succeed on the merits of her trademark infringement claim.

### 1.    *Digits 1 and 2 are not informative in keyword bidding cases.*

The first two digits of confusion— (1) the strength of the mark and (2) mark similarity— have little import, if any, in keyword bidding cases. Courts across the country have recognized that the similarity of the marks being used by the parties "is not the relevant analysis for determining the likelihood of confusion in the context of search term advertising." *1-800 Contacts, Inc. v. JAND, Inc.*, No. 21 Civ. 6966, 2022 WL 2316181, at *5 (S.D.N.Y. June 27, 2022).[54]

Rather, the proper comparison should be between the resulting **ads** for Sibrian and Quintessa, as this is how consumer confusion in the search-engine context would manifest. *See Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Found. of Am., Inc.*, 307 F. Supp. 3d 260, 291 (S.D.N.Y. 2018) ("The mere fact of AFA's purchase of the Association Marks either verbatim . . .or nearly verbatim. . . cannot in and of itself cause confusion . . . When examining the similarity of the marks in the AdWords context, the court must consider the degree of similarity between plaintiff's service mark and the defendant's advertisements appearing on the search-results page.") (internal citations and quotations omitted). Thus, the court can reject Sibrian's argument that that "mark similarity" weighs in her favor. *See* Mot. at 14-15.

---

[53] *See also Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 483–84 (5th Cir. 2004), a*brogated in part on other grounds by Baker v. DeShong*, 821 F.3d 620 (5th Cir. 2016) ("The digits are a flexible and nonexhaustive list. They do not apply mechanically to every case and can serve only as guides, not as an exact calculus.").

[54] *See also Alzheimer's Disease,* 307 F. Supp. 3d at 287 (holding that use of a plaintiff's mark as an AdWord is diversion not confusion); *Network Automation*, 638 F.3d at 1154 (finding the district court erred in relying on similarity of marks, goods and trade channels because those factors "fail[] to discern whether there is a likelihood of confusion in a keywords case."); *1–800 Contacts*, 722 F.3d at 1245 ("[T]he similarity of the search term and 1–800's mark is of minor relevance . . . [An] inference [that a trademark owner is the source of another webpage] is an unnatural one when the entry is clearly labeled as an advertisement and clearly identifies the source, which has a name quite different from the business being searched for."); *New England Mercantile Grp., LLC v. Barnell*, No. X03HHDCV146069683S, 2019 WL 2307446, at *8 (Conn. Super. Ct. Apr. 2, 2019) (rejecting argument that the marks are identical when the plaintiff does not claim that the defendant is using its mark or a similar mark in a consumer-facing manner).

The relevant **ads** show Quintessa does not use Sibrian's Marks in its ad header, in the text of its ad, or in the URL for its link. *See* Mot., Exs. 8, 10. And Sibrian concedes that Quintessa does not use Sibrian's Marks in the text of its ads. Mot. at 6. Instead, Quintessa's ads show Quintessa's brand "Car Accident Helpline"[55] underneath the phone number in its ads.[56]

## 2. *Digits 3 through 5 are not informative in keyword bidding cases.*

Digits 3 (the similarity of the products or services), 4 (identity of retail outlets and purchasers) and 5 (identity of the advertising media used) are not informative of likelihood of confusion in the context of close competitors in search engine marketing. *See Network Automation v. Advance Sys. Concepts, Inc.*, 638 F.3d 1137, 1154 (9th Cir. 2011) (finding the district court erred in relying on proximity of goods and marketing channels because those factors "fail[] to discern whether there is a likelihood of confusion in a keywords case.").

Sibrian argues, in a conclusory fashion, that because Quintessa directly and closely competes with Sibrian to develop clients for personal injury cases through internet advertising, that these three digits support a finding of likelihood of confusion. Mot. at 15-16. Sibrian fails to appreciate that these digits, while applicable to traditional trademark infringement cases, in keyword advertising among close competitors "will appear to indicate confusion even if no confusion is likely." *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 485 (5th Cir. 2004), a*brogated in part on other grounds by Baker v. DeShong*, 821 F.3d 620 (5th Cir. 2016). By

---

[55] *See* Ex. A (Mingee Decl.) ¶ 7.
[56] Oddly, Sibrian attempts to support her Motion by pointing to ads **_that don't even belong to Sibrian_**. *See, e.g.*, Motion at 4-5 (referencing Exs. 21 and 26 as Sibrian ads). For example, the ads depicted in Exhibits 21 and 26 to the Motion were posted by Agree Media, another lead generator that operates personal-injury.lawsuit-support-now.com. *See* Ex. E (Sibrian's Cease & Desist Letter to Agree Media). Unlike Quintessa, Agree Media used Sibrian's name in their ads without Sibrian's permission. *Id.* Sibrian sent Agree Media a cease-and-desist letter asking them to stop using her name in their ads, to which Sibrian attached the ads shown in Exhibits 21 and 26. *Id.* Sibrian also produced correspondence in which Agree Media ████████████████████████████████████████ ████████████████████████████████████████████. *See* Ex. F (Agree Media's Response to Sibrian's Cease & Desist Letter).

definition, close competitors will target identical or nearly identical purchasers and use identical or nearly identical advertising media for identical or nearly identical products or services. *Id.*

Digit 3, the similarity of the products or services, weighs, at best, neutral, where Quintessa's advertisements make no mention of Sibrian, and where consumers exercise a high degree of care when exercising choice among similar products. *Network Automation*, 638 F.3d at 1151. Likewise, Digits 4 and 5 weigh, at best, neutral, because the shared use of a ubiquitous marketing channel, *i.e.*, the internet, "does not shed much light on the likelihood of consumer confusion." *Id.*; *see also Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004) ("Given the broad use of the Internet today, the same could be said for countless companies. Thus, this factor merits little weight."). Thus, in this case, Digits 3 through 5 fail to illuminate a likelihood of customer confusion and instead merely reveal what is already clear: Quintessa and Sibrian are close competitors for personal injury leads.

### 3. *Digit 6: Sibrian has not proven intent to mislead or confuse.*

The sixth digit – Quintessa's intent – also weighs against a finding of likelihood of confusion. "Trademark infringement is willful 'if it is done voluntarily and intentionally and with the specific intent to cause the likelihood of consumer confusion and with the intent to cause confusion, to cause mistake, or to deceive.'" *Appliance Liquidation Outlet, L.L.C. v. Axis Supply Corp.*, 105 F.4th 362, 384–85 (5th Cir. 2024) (quoting *Quick Techs., Inc. v. The Sage Grp., PLC*, 313 F.3d 338, 349 n.9 (5th Cir. 2002)). "The infringer must have a 'subjective belief that it was, in fact, guilty of trademark infringement.'" *Id.* (quoting *Nat'l Bus. Forms & Printing, Inc. v. Ford Motor Co.*, 671 F.3d 526, 538 (5th Cir. 2012)). Here, Sibrian cannot show that Quintessa intended to cause consumer confusion.

### i. Sibrian offers no compelling evidence that Quintessa intended to cause consumer confusion.

Sibrian's "evidence" of intent to confuse lacks both logic and merit. Sibrian contends that Quintessa "actually train[s] their employees to answer calls in a way that disguises their lack of affiliation with Sibrian." Mot. at 17. However, employees in Quintessa's intake center have been trained to dispel any conceivable confusion and are instructed to inform callers: ██████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████ [57]

While Sibrian claims that certain call transcripts show a "scheme" by Quintessa to confuse consumers, the transcripts show the opposite. For example, in Exhibit 31, when it became clear that the caller was asking ████████████████████████████████████████

███████████████████████████████████████████████████████

*See* Mot., Ex. 31, 3:25-4:13. And none of the call recordings Sibrian relies on show that Quintessa's intake representatives attempted to trick callers into believing they had called Sibrian. To the contrary, the transcripts show that Quintessa's intake representatives clearly explain that the caller is talking to a third-party intake representative. *See e.g.*, Mot., Ex. 33, 2:9-14 ████████████████

███████████████████████████████████████████████████████

████████████████

Sibrian hypothesizes that Quintessa's "entire purpose for purchasing the Sibrian Marks" is to "capitalize" off of potential clients by "cutting in line ahead of Sibrian." Mot. at 19. "Intent to

---

[57] *See* Ex. A (Mingee Decl.) ¶ 6; Ex. A-1 (Quintessa's Current Intake Call Center Script) at 20. From August 2021 to early August 2024, Quintessa's script stated ████████████████████████████████████████████

███████████████████████████████████████████████████ Ex. A-2 (Quintessa's Prior Intake Call Center Script) at 24; Ex. A (Mingee Decl.) ¶ 6.

compete, however, is not tantamount to intent to confuse." *Scott Fetzer*, 381 F.3d at 486l; *see also Jim S. Adler, P.C. v. McNeil Consultants, L.L.C.*, 10 F.4th 422, 428 (5th Cir. 2021) (recognizing that distraction is not confusion and that distraction is insufficient to constitute infringement). Though Sibrian takes issue with competitors bidding on the Sibrian Marks, "liability for trademark infringement has never turned on 'free riding' per se: the test has always been whether there is a likelihood of confusion. Sometimes, 'free riding' is no more than a form of ***fair competition***."[58] Indeed, competitor bidding, *i.e.* bidding on a competitor's branded marks, is a practice that occurs in many competitive industries.[59] Because Sibrian has not evinced compelling evidence of intent to confuse, this digit does not support a finding of a likelihood of confusion. *Id.*

### ii. Quintessa has a good faith legal basis for keyword bidding.

Quintessa has a good faith legal basis for believing that the law permits it to bid on Sibrian's Marks in keyword advertising. No law prohibits Quintessa—or other law firms or lead generation agencies—from bidding on branded keywords or the trademarks of another in search engine advertising. To be sure, more than eight years ago, the Professional Ethics Committee for the State Bar of Texas issued an opinion stating that "[a] lawyer does not violate the Texas Disciplinary Rules of Professional Conduct by simply using the name of a competing lawyer or law firm as a keyword in the implementation of an advertising service offered by a major search-engine company."[60] Google itself does not restrict the use of trademarks as keywords.[61]

And it is well-established in almost every jurisdiction that bidding on a competitor's trademark as a search engine keyword alone does not violate the Lanham Act as a matter of law, especially where, as here, Sibrian's Marks are not displayed in the text of Quintessa's

---

[58] 5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25A:8 (5th ed. 2024) (emphasis added).
[59] *See* Ex. H (Jansen Decl.) ¶¶ 6, 8.
[60] Professional Ethics Committee for the State Bar of Texas, Opinion No. 661 at 3 (July 2016).
[61] Ex. H (Jansen Decl.) ¶ 8.

advertisements. *See, e.g.*, *Alzheimer's Disease*, 307 F.Supp.3d at 284 ("Virtually no court has held that, on its own, a defendant's purchase of a plaintiff's mark as a keyword is sufficient for liability.").[62] In particular, the Northern District of Texas has held that the purchase of another company's trademarks is permissible, even after a jury finding of willful infringement. *See Mary Kay, Inc. v. Weber*, 661 F.Supp.2d 632, 646 (N.D. Tex. 2009) (refusing to enjoin company from engaging in keyword bidding in part because "[u]nder federal trademark law" it is a "lawful" use of another's trademark.).

　　For these reasons, courts have consistently refused to enjoin keyword bidding. *See, e.g.*, *id.* (granting an injunction on other grounds but expressly stating "[t]his holding does not mean . . . that the defendants may not purchase the words 'Mary Kay' as a search term from search engines such as Google or Yahoo."); *Deltona Transformer Corp. v. The Noco Co.*, No. 6:19-CV-308-CEM-LHP, 2023 WL 6376363, at *9 (M.D. Fla. Sept. 29, 2023) (refusing to enjoin keyword bidding); *Concordia Partners*, 2015 WL 4065243, at *9 (refusing to enjoin keyword bidding even after a finding of willful infringement). In *Texas Tamale Company*, this Court recently denied an injunction seeking to prohibit the defendant from purchasing the plaintiffs' trademarks, "TEXAS TAMALE" and "TEXAS TAMALES," as keywords in the defendant's Google advertisements. *Tex. Tamale Co., Inc. v. CPUSA2, LLC*, No. 4:21-CV-3341, 2024 WL 2836241, at *4 (S.D. Tex. June 4, 2024). In denying injunctive relief, this Court recognized:

　　　　"Because the purchase of Google AdWords or keywords, in and of itself, does not constitute infringement of Plaintiff's Marks, Plaintiff is not entitled

---

[62] *See WorkshopX Inc. v. Build a Sign, LLC*, No. 1:18-CV-850-RP, 2019 WL 5258056, at *2 (W.D. Tex. June 26, 2019), *report and recommendation adopted*, No. 1:18-CV-850-RP, 2019 WL 5243187 (W.D. Tex. July 12, 2019) ("[I]n and of itself—using a competitor's trademark as a Google AdWords keyword does not constitute trademark infringement."); *Cohen v. Hot House Beauty Ltd.*, No. CV 22-1646, 2023 WL 4408919, at *5 (W.D. Pa. June 14, 2023), *report and recommendation adopted*, No. 2:22-CV-1646, 2023 WL 4405826 (W.D. Pa. July 7, 2023) ("[T]he purchase of the mark alone would not create liability under the Lanham Act.").

to an injunction prohibiting the purchase of Plaintiff's Marks as keywords or Google AdWords."

*Id.*

Thus, Quintessa has a good faith belief that its conduct complies with the law. Accordingly, this factor weighs against a finding of likelihood of confusion.

### 4. *Digit 7: Sibrian has not proven actual confusion as a matter of law.*

"The sine qua non of trademark infringement is consumer confusion caused by the infringing behavior, and behavior meant to harm a competitor does not necessarily entail infringement if a consumer is unlikely to be confused." *Alzheimer's Disease*, 307 F. Supp. 3d at 287. "Mere diversion, without any hint of confusion, is not enough." *Hearts on Fire Co., LLC v. Blue Nile, Inc.*, 603 F. Supp. 2d 274, 286 (D. Mass. 2009). The Fifth Circuit explains, "in the context of internet searches and search-engine advertising in particular, the critical issue is whether there is consumer confusion. ***Distraction is insufficient***." *Adler*, 10 F.4th at 428 (emphasis added); *see also* 5 McCarthy on Trademarks and Unfair Competition § 25A:8 (5th ed. 2024) ("But distraction or diversion is not the same as 'confusion' by the web shopper."). Sibrian's evidence of actual confusion is insufficient for two reasons: (1) the evidence of purported actual confusion represents nothing more than *de minimis* confusion, and (2) the evidence in fact shows a ***lack*** of actual confusion.

Sibrian's evidence of actual confusion consists of call logs made by Quintessa's intake call representatives. But a holistic view of the data shows this alleged confusion to be *de minimis*. It is well established that incidents of confusion must be considered in light of the total course of the parties' competition. As the Fourth Circuit has explained: "Evidence of the number of instances of actual confusion must be placed against the background of the number of opportunities for confusion before one can make an informed decision as to the weight to be given to [sic] the

evidence. If there is a very large volume of contacts or transactions which could give rise to confusion and there is only a handful of instances of actual confusion, the evidence of actual confusion may receive relatively little weight." *George and Co. LLC v. Imagination Ent. Ltd*., 575 F.3d 383, 398 (4th Cir. 2009) (citing 4 J. Thomas McCarthy, MᴄCᴀʀᴛʜʏ ᴏɴ Tʀᴀᴅᴇᴍᴀʀᴋs ᴀɴᴅ Uɴғᴀɪʀ Cᴏᴍᴘᴇᴛɪᴛɪᴏɴ § 23:14 (4th ed. 2014)).[63]

In *Lerner & Rowe, PC v. Brown Engstrand & Shely LLC, et al.*, a keyword bidding case involving lawyers, the court granted summary judgment in favor of the defendant, a law firm engaging in keyword bidding on the plaintiff's name, due in part to lack of actual confusion. No. CV-21-01540-PHX-DJC, 2023 WL 3568201, at *11 (D. Ariz. May 18, 2023). There, the court found that similar call logs in which the plaintiff's name – Lerner & Rowe – was mentioned ***236 times over the course of four years*** – was *de minimis*. *Id*. at *6-7. In that case, there were 109,322 impressions for the defendants' advertisements during the relevant period triggered by searches for some version of "Lerner & Rowe." *Id*. at *7. Even assuming that all 236 callers who mentioned "Lerner & Rowe" were confused by [the d]efendants' use of keywords, the court calculated that 236 instances of potential confusion compared to 109,322 impressions constituted a *de minimis* ***0.215%*** of the total number of possible instances of confusion. *Id*. The court concluded that "[t]his tiny percentage cannot reasonably be said to constitute an 'appreciable' or 'significant' number of consumers confused by [the d]efendants' advertising strategy. Nor can it be said to show that [the d]efendants' marketing strategy made confusion likely." *Id*.

The same analysis—and results—applies with equal force here. There have been only ■ ████████████████████████████████████████████,[64] compared to the 236 calls in *Lerner* over

---

[63] *See also Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc*., 130 F.3d 88, 95 (4th Cir. 1997) ("In light of [Plaintiffs] huge volume of commerce, [Plaintiffs] meager evidence of actual confusion is at best *de minimis*.").
[64] *See* Mot., Ex. 2.

the same time span. ████████████████████████████████████████████████

████████████████████████████████████████████████████.[65] Out of everyone that saw

Quintessa's ads, ███████████████████████████ equivalent to .1% of the total

number of possible instances of confusion. This is roughly half of the .215% rate of possible

confusion that the court found insufficient in *Lerner*. *Lerner*, 2023 WL 3568201, at \*7; *see also 1-*

*800 Contacts*, 722 F.3d at 1249-50 (finding no genuine issue of fact existed as to likelihood of

confusion where defendant's use of "1800Contacts" or some variation as a keyword generated

more than 448,000 impressions but only 3,163 clicks, yielding a .7% click-to-impressions rate);

*Flushing Bank v. Green Dot Corp.*, No. 13-Civ-9120, 2015 WL 5802385, at \*19 (S.D.N.Y. Oct.

5, 2015) (stating a "dozen or so inquiries spread over a period of time—and during the pendency

of a litigation in which it can be assumed the company was actively on the look-out for any

instances of actual confusion—are minimal).[66]

 Worse for Sibrian, the ██ alleged instances of actual confusion do not show that these

callers were confused at all. Instead, the call notes reveal that ████████████████████████

████████████████████████████████████████████████████ *See* Mot., Ex. 2

---

[65] *See* Ex. A-3 (Sibrian Keywords and Search Terms Spreadsheet) ████████████████████████████
████████████████████████████████████████████████████████████████████

[66] These principles are well-established. *See, e.g., George & Co. LLC*, 575 F.3d at 398 (finding four instances of actual confusion *de minimis* when measured against significant sales volume); *Nautilus Grp., Inc. v. ICON Health and Fitness, Inc.*, 372 F.3d 1330, 1338 (Fed. Cir. 2004) (finding four misdirected phone calls out of thousands a "relatively small number" "too unreliable to establish actual confusion."); *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 123–24 (2d Cir. 2001) ("[W]e do not believe the district court erred in finding that two anecdotes of confusion over the entire course of competition constituted *de minimis* evidence insufficient to raise triable issues."); *Petro Stopping Centers*, 130 F.3d at 95 (holding that when measured against a substantial volume of commerce, isolated instances of actual confusion are *de minimis*); *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 284 (6th Cir. 1997) (holding that isolated instances of actual confusion when there has been extensive advertising do not always indicate an increased likelihood of confusion and in fact may indicate the opposite); *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 173 (7th Cir. 1996) ("[T]he plaintiff's evidence that two consumers (out of how many thousands?) may have been misled cannot by itself be thought to create a contestable issue of likelihood of confusion even if the evidence, which is hearsay, is admissible and credible, which we doubt."); *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1110 (6th Cir. 1991) (holding that where parties have advertised extensively and are doing business in the same area, isolated instances of actual confusion are not conclusive or entitled to great weight).

at 2. This is not actual confusion. *See Streamline*, 851 F.3d at 457 (holding that evidence of actual confusion must demonstrate more than a "fleeting mix-up of names"). The absence of any evidence of consumer confusion requires the Court to weigh this factor against Sibrian.

     **5.**      ***Digit 8: Sibrian has not proven that consumers are unsophisticated.***

Digit 8 relates to the degree of care that potential purchasers of a plaintiff's products and services are likely to exercise. *Springboards to Educ., Inc*., 912 F.3d at 817 (citing *Streamline Prod., Inc*., 851 F.3d at 458) ("[T]he greater the care potential purchasers exercise, the less likely it is they will confuse a junior mark user's products or services with the senior mark user's products or services."). A key factor upon which the likely degree of care depends is the cost of the products and services. *See Streamline Prod., Inc*., 851 F.3d at 458 (internal citation omitted). Courts have repeatedly found that potential purchasers who buy "for professional or institutional purposes at a high cost . . . are virtually certain to be informed, deliberative buyers." *US Risk Ins. Grp., Inc. v. US Risk Mgmt., LLC*, No. 3:11-CV-2483, 2013 WL 4504754 at *17 (N.D. Tex. Aug. 20, 2013) (citing *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 173 (5th Cir. 1986)); *see also Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 297 (5th Cir. 2020) (quoting *Smack Apparel Co.,* 550 F.3d at 483) (acknowledging that purchasers of "relatively inexpensive" items "may take less care in selecting the item[.]").

Sibrian fails to adduce any evidence to support her belief that consumers who seek personal injury representation are vulnerable, unsophisticated, and unfamiliar with the concept of paid search results. *See* Mot. at 20-21. The relevant recent case law, along with the evidence, show that potential clients seeking personal injury representation are sophisticated, exercise a high degree of care, are aware of the high cost of representation, and can easily navigate paid advertisements and

organic results.[67] "[A] person familiar enough with the internet to use a search engine to seek a lawyer should be aware that there are advertisements presented on web pages showing search results."[68] Thus, it is "highly unlikely that a reasonable person using an internet search engine would be misled into thinking that every search result indicates that a lawyer shown in the list of search results has some type of relationship with the lawyer whose name was used in the search."[69] *See also 1-800 Contacts, Inc.*, 2022 WL 2316181, at *6 ("[T]he relevant consumer base here would be sophisticated enough to (1) review the results of their online search—including linked website addresses that will navigate them to a different website when clicked—before clicking on such links, and (2) review the contents of any website that they have navigated to before taking further action, such as making an online purchase and providing sensitive payment information.").[70] Therefore, this factor weighs against a finding of likelihood of confusion.

### C.    The Remaining Factors Do Not Support Injunctive Relief.

Sibrian must "establish that [its] irreparable harm is greater than the hardship that the preliminary injunction would cause [Quintessa]." *Acme Refrigeration Supplies, Inc. v. Acme Refrigeration of Baton Rouge, Inc.*, 961 F. Supp. 936, 939 (E.D. La. 1996). Here, Sibrian has failed to establish a likelihood of success on the merits. Thus, an injunction would only serve to harm Quintessa's legitimate and lawful use of Google's keyword bidding. Accordingly, the balance of

---

[67] *See* Ex. H (Jansen Decl.) ¶¶ 6, 11-17.

[68] Professional Ethics Committee for the State Bar of Texas, Opinion No. 661 at 2-3 (July 2016).

[69] *Id.*

[70] In other words, reasonable internet consumers can take time to review online search results and any websites—or click to call links—they may navigate to. Consumers "diverted on the Internet can more readily get back on track than those in actual space, thus minimizing the harm to the owner of the searched-for site from consumers becoming trapped in a competing site." *1-800 Contacts, Inc.*, 2022 WL 2316181, at *7. As the leading treatise on trademark infringement explains, "a computer user who sees a search engine results page and clicks on a non-deceptive advertising link resulting from a trademark keyword purchased by a competitor is not confused as to the source or affiliation of any ultimate purchase that is made from that website." 5 McCarthy on Trademarks and Unfair Competition § 25A:8 (5th ed. 2024).

---

harms favors Quintessa. Similarly, where, as here, the "plaintiff fails to demonstrate likelihood of success and irreparable injury, the public interest factor will favor the defendant." *Vista India v. Raaga*, LLC, 501 F. Supp. 2d 605, 625 (D.N.J. 2007).

## V.    CONCLUSION

For all of these reasons, Quintessa respectfully asks the Court to deny Sibrian's Motion for Preliminary Injunction.

DATE:  August 29, 2024                  Respectfully submitted,


                                        */s/ Christopher J. Schwegmann___*
                                        Christopher J. Schwegmann
                                        Texas Bar No. 24051315
                                        cschwegmann@lynnllp.com
                                        SDTX ID No. 609501
                                        Jessica D. Cox
                                        Texas Bar No. 24114769
                                        jcox@lynnllp.com
                                        SDTX ID No. 3888866
                                        **LYNN PINKER HURST & SCHWEGMANN, LLP**
                                        2100 Ross Avenue, Suite 2700
                                        Dallas, Texas 75201
                                        (214) 981-3800 Telephone
                                        (214) 981-3839 Facsimile

                                        Rebecca L. Adams
                                        Texas Bar No. 24098255
                                        rebecca.adams@quintessamarketing.com
                                        SDTX ID No. 2925001
                                        **QUINTESSA, LLC**
                                        1900 Northwest Expy # 1600,
                                        Oklahoma City, OK 73118
                                        (888) 231-9722 Telephone


                                        **ATTORNEYS FOR DEFENDANTS**



                            **CERTIFICATE OF SERVICE**

        I hereby certify that on August 29, 2024, a true and correct copy of the foregoing was
served upon all counsel of record via the Court's ECF system.

                                        */s/ Christopher J. Schwegmann__*
                                        Christopher J. Schwegmann